In re Charles Barry **WINGFIELD**, a/k/a C. Barry Wingfield, a/k/a Barry Wingfield, Debtor.

Charles Barry **WINGFIELD**, a/k/a C. Barry Wingfield, a/k/a Barry Wingfield, Plaintiff,

v.

**UNITED STATES** of America, Internal Revenue Service, Defendant.

Bankruptcy No. 81 M 1379.

United States Bankruptcy Court, D. Colorado.

Oct. 7, 1981.

Joseph H. Hellewell and Michael Minton, Greeley, Colo., for plaintiff.

Angelo I. Castelli, Washington, D. C., and Jimmye S. Warren, Denver, Colo., for defendant.

## MEMORANDUM OPINION

JOHN P. MOORE, Bankruptcy Judge.

THIS MATTER arises out of a complaint filed by a Chapter 13 debtor, Dr. C. Barry Wingfield, to void a penalty assessed against him pursuant to 26 U.S.C. § 6672. The penalty was assessed, and a counterclaim filed in this case, upon the theory that Dr. Wingfield was a person responsible to collect, account for, and pay over trust fund taxes of Ag Consultants, Inc., a corporation of which Dr. Wingfield was an officer, director, and stockholder. Plaintiff's case is principally based upon the assertion that he was not in a controlling or management position with Ag Consultants, and his offices were only nominally held. Thus, the seminal issue is whether the Plaintiff was indeed a "responsible person" within the context of § 6672 as asserted by the government.

## I

Ag Consultants was a small agricultural and environmental consulting firm which conducted business principally in Eastern Colorado during the years 1977 through 1980. Although Ag Consultants was originally conceived by Earlie Thomas, a college acquaintance of the Plaintiff, Dr. Wingfield joined forces with Thomas before the commencement of business. Their business association began with an agreement the Plaintiff would be, as he later said in his own words, an "equal partner"[1] with Thomas.

With that agreement established, Dr. Wingfield attended the Ag Consultants' "incorporator's meeting" held on April 8, 1977. At this meeting, Plaintiff was elected a member of the original board of directors,[2] and was designated to join with Thomas, the president of the corporation, in marketing the business. However, because he was employed by another firm at the time, Dr. Wingfield did not actually go on Ag Consultants' payroll until early 1978. In the interim, he did meet with and consult with employees and others regarding the business of Ag Consultants.

When Dr. Wingfield commenced full-time employment in January, 1978, the company had only "a couple" laboratory technicians and "a couple people in the field" on the payroll aside from himself and Mr. Thomas. Over the span of the next 22 months, when

1. Exhibit E, p. 4, line 1 of the Plaintiff's handwritten statement.

2. Exhibit G, Minutes of Meeting of April 8, 1977.

Dr. Wingfield severed relations with the company, the staff had grown to approximately 25 people. Perhaps this growth, coupled with ineffective management led to the ultimate financial difficulties of Ag Consultants.

In the main, the company was service-oriented and it dealt principally with the technical application of pest and weed control methodology in which Dr. Wingfield's academic background and knowledge were very important. Indeed, he and Mr. Thomas, both entomologists, came into this business with much more technical expertise than commercial accumen. Thus, it is not surprising that at least until the later stage of affairs when the company retained a comptroller, the business was operated in a relaxed and unstructured manner more closely related to academia than commerce.

Both Thomas and Wingfield devoted their primary efforts to the field, seeking new business and applying their skills to services rendered to clients of the firm, leaving to others the workaday task of running the office. Yet, it is clear to me that within the loosely knit fabric of this company, Wingfield and Thomas shared in the decision-making functions normally regarded as "corporate management". Although the company always had either a "business manager" or a comptroller, both Thomas and Wingfield participated throughout in discussions and decisions on matters relating to personnel, receivables, capital acquisition, corporate policy, payables, financing, and other affairs. Initially, discussions were conducted between the men as needed; then, for a time, the two met with Mr. Hayes, the business manager. As time passed, the meetings took on a different form, and regular Monday morning staff meetings were held each week. After the staff meeting, another meeting was always held which was attended by what one former employee described as the "management team". Both Thomas and Wingfield regularly attended all these meetings and participated in discussion of the previously described subjects.[3]

It was at these so-called "management team" meetings that the principal policies and problems were discussed and decided. Thus, as these weekly informal management team meetings were attended by the corporate directors, they functioned in a very real and practical way as director's meetings,[4] even though no formal notices were given, and no minutes were taken.

In addition to his performance of a director's role, as that concept was so loosely and informally applied, Dr. Wingfield held two corporate offices. Given the unstructured and unrecorded manner in which corporate affairs were handled, it is not surprising that it is now uncertain how or when these offices were acquired. Indeed, Dr. Wingfield would have us believe the offices simply devolved upon him as an accommodation to Mr. Thomas, and he really did not consider himself to be, or function as, a corporate officer. Other circumstances erode the credibility of this position.

In a report [5] concerning an interview conducted by an agent of the Internal Revenue Service, Dr. Wingfield wrote answers to several questions regarding Ag Consultants. He was asked: "What status or official capacity have you held with this corporation", and he responded: "Probably an officer." [6] He was also asked: "Who have been officers? (Note dates of services)", and he responded: "Earlie Thomas, Barry Wingfield V.P. 12–77 to 10–15–79." Other documents also record his capacity as an officer.

3. Wingfield and Thomas also met with and were advised on financial matters by the comptroller and the Company's outside accountant.

4. Although Wingfield testified he took part in no votes of the board, minutes of the formal meeting held on November 2, 1978 clearly indicate to the contrary.

5. Exhibit E.

6. In the same exhibit he also acknowledged his capacity as a director.

On July 24, 1978, in a Small Business Administration loan application [7], Dr. Wingfield signed a corporate resolution as vice president, and certified the veracity of the resolution as secretary. In the same application, he also attested the note and security agreement given S.B.A. for a loan of $80,000.00 to Ag Consultants. Cooperative agreements between Ag Consultants and the Wyoming Department of Agriculture executed on December 1, 1978 [8] and June 15, 1979 [9] were signed by Wingfield as Vice President. The 1979 corporate annual report filed with the Colorado Secretary of State [10] indicates on April 13, 1979 Wingfield was vice president, secretary and treasurer of Ag Consultants. He sent a memo dated June 7, 1979 to all area managers and employees setting forth automobile policy for the company.[11]

The signing of these documents was clearly in keeping with the function of a corporate officer, and when taken together, the documents create an inference Dr. Wingfield was at least a *de facto* officer of Ag Consultants. When this documentary evidence of Dr. Wingfield's capacity is compared with the fact he was authorized to, and did frequently sign corporate checks, and with the way in which he took part in corporate management, and when these circumstances are placed in the matrix in which the corporation functioned, any question that Dr. Wingfield was a self-asserted, fully authorized and functioning corporate officer is eliminated. His testimony to the contrary is simply not credible.

The same conclusion may be drawn regarding his testimony of the extent of his ownership of Ag Consultants' stock. Dr. Wingfield first testified that he only owned 750 shares obtained through pre-employ-ment service to the company. He later acknowledged he was to be an "equal partner" with Thomas and that he was to own "approximately 45 percent" of the stock. He denied receiving that stock, however. Notwithstanding, documented evidence clearly establishes that as part of the previously described S.B.A. loan transaction in July, 1978, Wingfield was assigned 8,000 shares.[12] When these shares were coupled with the 750 shares he initially acquired, it appears clear Dr. Wingfield in fact owned approximately 40 percent of the 23,000 shares issued and outstanding.[13]

As a consequence of these factors, I am satisfied Dr. Wingfield was a substantial owner of Ag Consultants, and a functioning and responsible corporate officer and director. His testimony which was designed to show he was a mere employee with neither authority nor responsibility will not withstand the test of contrary evidence. Without regard to apparently contradicting statements [14] which may have been made by Mr. Thomas from time to time, it is my firm conclusion Dr. Wingfield was more than employee or investor. He was one of the two persons in general control, who participated in decisions concerning payment of creditors and disbursement of funds. Hence, it is clear Dr. Wingfield was a "responsible person". 26 U.S.C. § 6671(b); *Monday v. U.S.*, 421 F.2d 1210 (7th Cir., 1970); *Neckles v. U.S.*, 579 F.2d 938 (5th Cir., 1978).

## II

Despite the extent of Dr. Wingfield's capacity with Ag Consultants, the penalty assessment is valid against him only if he willfully failed to account for and pay over

7. Exhibit I.

8. Exhibit K.

9. Exhibit J.

10. Exhibit H.

11. See contents of Exhibit L.

12. Exhibit M.

13. Of the balance, 12,000 were owned by Thomas and the rest by persons who had little or no connection with management.

14. Whether the statements were contradictory must be judged in light of the circumstances under which, and the persons to whom they were made. In that light I do not find them contradictory, but there is no need to go into further detail.

Ag Consultants' trust fund taxes.[15] Therefore, since he denies such conduct, his knowledge and subsequent acts come under scrutiny. Once again, these factors must be placed into context with the way in which business was conducted at Ag Consultants.

The rather tenuous financial condition of the company began to worsen in June, 1979, and it was from this time on that the regular Monday meetings of the management team became concerned with what Mr. Thomas called "the critical financial condition of the company." Indeed, by this time Thomas had learned of and made known to the directors the company's sizable tax liability. He also had made arrangements to meet with agents of the IRS to attempt rectification of the problem.

Even though Dr. Wingfield was invited to go to this meeting by Thomas, Wingfield refused. Nonetheless, it is clear to me that Dr. Wingfield knew and understood by then that the corporation had a substantial federal tax liability. He may not have known the exact amount of the liability, but he knew the company was in trouble.

That trouble was carrying over into an inability to meet the demands of creditors other than the government. Indeed, by this time all bills were being paid in accordance with the degree of pressure asserted by creditors and the availability of money.

In the field, employees were also becoming aware of the financial trouble. Creditors of the Company who also held individual guarantees of certain employees (as well as Dr. Wingfield) were beginning to press for payment. On at least one occasion, salary checks were delayed, and then when they were finally deposited, the checks were returned as insufficient.

Because of those circumstances, Thomas called a meeting of staff and employees in late August to discuss the problem. In attendance were members of the management team, including Dr. Wingfield, as well as area managers and field scouts.

From the testimony, it would appear that this meeting was like Armageddon for the company. By that time, if employees were not in an ugly mood, they were at least agitated, and there was a clear division between Thomas on one side and Wingfield and the field staff on the other. Moreover, their mood did not improve when Thomas told them "the IRS is breathing down our necks" and that "the IRS wants to close us down".[16] When Dr. Wingfield rose to pursue a question regarding the tax problem, heated words were exchanged between him and Thomas, and Wingfield stalked from the meeting.

After the meeting was over, Dr. Wingfield realized it was time for him to look for other employment, and he did so. In the meantime, he went to the offices of Ag Consultants from time to time to collect messages until he submitted his resignation on October 1, 1979, effective October 15, 1979.

It was while he was in this limbo-like status that Dr. Wingfield began to hear from certain field personnel that not only were they owed back salary, but they were also going to be forced into paying those outstanding corporate bills previously guaranteed by them. Thus, it was decided[17] that friendly growers were to be contacted and advised to send payment on their Ag Consultants' accounts to Wingfield rather than the company. Wingfield, in turn, promised to use these receipts to pay unpaid salaries as well as the creditors who were dunning the employees. Thus, over the course of about one and a half months[18], including a period after his resignation, Wingfield collected accounts receivable belonging to Ag Consultants in the aggregate of almost $5,800.00 which he deposited to his own bank account and distributed to himself, certain employees, and certain creditors of Ag Consultants.

15. 11 U.S.C. § 6672(a).

16. From this, they all understood the company owed taxes to the government.

17. By whom can only be surmised.

18. Between October 12, 1979 and November 30, 1979.

These transactions were not known to Thomas, Johnny Square, the comptroller, or any other persons at Ag Consultants except the benefited employees. According to Wingfield's own statement he undertook to deal in this fashion with corporate assets only on the strength of his "authority to sign checks."

When Thomas discovered the missing receipts and the scope of Wingfield's distribution of the proceeds from accounts receivable, Thomas went straight to the company's lawyer. The lawyer, in turn, wrote a strongly worded letter[19] to Wingfield. After receipt of the letter, Wingfield made no further collections or distributions, although he did receive a check from a customer which he forwarded "to the IRS".

Wingfield now claims that he made the collections and distributions with the knowledge and agreement of Thomas, but Thomas contends he only told Wingfield to help in collecting receivables in order to ease the company's financial burden. Of the two, I find Thomas more credible, for if he had agreed that Wingfield could take over the collection of these accounts and the distribution of their proceeds, why would Thomas have gone to a lawyer to put a stop to the practice? Indeed, there is only one plausible answer to this question, and that is Thomas did not assent.

Thus, we have a major stockholder, officer, and director who knows that his corporation owes taxes to the federal government, and yet completely without authority, and in his own interest and in the interest of his supporters and friends, he takes assets of the corporation and pays them to persons and entities other than the United States. In my judgment, this conduct is not only willful, but it is also unmitigated and the unquestionable basis for the conclusion that he willfully failed to account for and pay over taxes the collection of which was his responsibility. *Monday v. U.S.,* 421 F.2d 1210 (7th Cir., 1970); *Newsome v. U.S.,* 431 F.2d 742 (5th Cir., 1970); *Koegel*

*v. U.S.,* 437 F.Supp. 176 (S.D.N.Y., 1977). Judgment shall enter for the United States of America on its counterclaim.[20]

---

19. Exhibit 1.

20. An assessment was made against Dr. Wingfield on February 5, 1981 in the amount of $25,477.44. Exhibit A.